AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



LODGED
CLERK, U.S. DISTRICT COURT
6/21/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ CD ___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
June 22, 2022
CENTRAL DISTRICT OF CALIFORNIA
BY: __MR__ DEPUTY

United States of America

v.

JONATHAN ABDIEL MARTINEZ,
MARCO ANTONIO PACHECO, Jr., and
LEONTREY ERRICK GIPSON,

Defendants.

Case No.   2:22-mj-02411-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of June 13, 2022,  in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Interference with Commerce by Robbery |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Hannah Monroe*
_____
*Complainant's signature*

Hannah Monroe, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   June 22, 2022

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Pedro V. Castillo, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT

I, Hannah Monroe, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of criminal complaints and arrest warrants against Jonathan Abdiel MARTINEZ ("MARTINEZ"), Marco Antonio PACHECO, Jr. ("PACHECO"), and Leontrey Errick GIPSON ("GIPSON"), for a violation of 18 U.S.C. § 1951(a): Interference with Commerce by Robbery.

2.   This affidavit is also made in support of an application for a warrant to search the following:

a.   The premises located at 18424 Seine Avenue, Artesia, California, 90701, described more fully in Attachment A-1, believed to be the current residence of MARTINEZ ("**SUBJECT PREMISES 1**");

b.   The premises located at 219 E. 87th Place, Apartment 3, Los Angeles, California, 90003, described more fully in Attachment A-2, believed to be the current residence of GIPSON ("**SUBJECT PREMISES 2**");

c.   The premises located at 724 W. E Street, Wilmington, California, 90744, as described more fully in Attachment A-3, believed to be the current residence of PACHECO ("**SUBJECT PREMISES 3**");

d.   A silver Nissan Sentra bearing California License Plate number CC43G24 and Vehicle Identification Number ("VIN") 3N1AB7APXKY370788, described more fully in Attachment A-4 ("**SUBJECT VEHICLE 1**");

   e. A dark-colored Kia Optima bearing California License Plate number 7XRB350 and VIN KNAGM4A74F5615598, described more fully in Attachment A-5 ("**SUBJECT VEHICLE 2**");

   f. The person of MARTINEZ, described more fully in Attachment A-6;

   g. The person of PACHECO, described more fully in Attachment A-7; and

   h. The person of GIPSON, described more fully in Attachment A-8.

  3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery, Conspiracy to Commit Interference with Commerce by Robbery), 922(g)(1) (Felon in Possession of a Firearm), 924(c)(1)(A)(i), (ii) (Possession or Brandishing of a Firearm in Furtherance of a Crime of Violence) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, and B are incorporated herein by reference.

  4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.     I am a Special Agent of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed for approximately six years.  Prior to becoming a Special Agent, I was a Staff Operations Specialist with the FBI for approximately two and a half years.  I am currently a member of the FBI's Violent Crime Major Offenders squad in Long Beach, California.

6.     Since joining the FBI in 2014, I have received training in the investigation of violations of criminal law, such as drug-trafficking, computer-related crimes, and financial fraud, including several hundred hours of formal training at the FBI Training Academy in Quantico, Virginia.  During the time that I have been employed by the FBI, I have participated in investigations relating to organized crime, home-grown violent extremism, access device fraud, identity theft, narcotics, and computer intrusions.  I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting electronic and physical surveillance, working with informants, and the execution of search and arrest warrants.  Additionally, I have interviewed and/or debriefed informants and other witnesses who had personal knowledge regarding the subject matters of the investigations in which I have been involved, including narcotics trafficking and

firearms offenses.  I have also consulted with other, more experienced agents about robbery investigations, robbers' behavior, and where evidence of a robbery is likely to be maintained.

### III.  <u>STATEMENT OF PROBABLE CAUSE</u>

7.    Based on my training and experience, my review of investigative reports, my participation in this investigation, and my conversations with other law enforcement officers regarding the investigation, I know the following information.

### A.    Background of Investigation

8.    In December 2020, the Los Angeles Police Department ("LAPD") and the FBI initiated an investigation into drug trafficking organizations operating out of the Harbor Area of Los Angeles, California.  Specifically, LAPD and FBI are targeting "shot-callers" and influential members of the Westside Wilmas street gang who are believed to be involved in a host of illicit activities including drug trafficking, weapons trafficking, extortion, robbery, and other violent acts.  This investigation has identified numerous prominent members of the gang including MARTINEZ, aka "Firm," "Little Peanut," or "Nutty Boy," and PACHECO, aka "Goon."  Based on my conversations with confidential human sources, examination of text messages, and other information from digital devices seized from Westside

Wilmas members, I believe that the Westside Wilmas are controlled by a Mexican Mafia member named Raul Molina.[1]

9.     Westside Wilmas commit the crimes of the organization under the larger direction and authority of the Mexican Mafia, a prison-based gang in California that controls many of the Hispanic street gangs in and around Los Angeles.  Revenue in the form of "taxed" proceeds from the Wilmas' criminal activities is collected by Wilmas gang leaders who then contribute a portion of those monies to Mexican Mafia leaders as "tribute" to the overall organization and Mexican Mafia leaders, including Wilmas gang members who have become "made" members of the Mexican Mafia.

10.    Mexican Mafia leaders direct the activities of the Wilmas gang from within the California state prison system. Mexican Mafia leaders also designate Wilmas members for leadership roles and responsibilities and ensure that the Mexican Mafia receive their allotted portion of the revenues generated from the Wilmas' criminal activities.  The Wilmas gang controls its territory through intimidation and acts of violence directed against rival gang members, fellow Wilmas gang members, and the general public.

---

[1] MOLINA is currently housed at a California Department of Corrections and Rehabilitation facility.  MOLINA is currently serving a life without parole sentence for a violation of California Penal Code 187 (murder in the second degree).

**B.   June 13, 2022 – MARTINEZ, PACHECO, and GIPSON Rob a Marijuana Dispensary at Gunpoint**

11.   On or about June 13, 2022, at approximately 10:16 p.m., LAPD dispatch received a 911 call from an unknown person who stated that he or she had received text messages from an employee at an unlicensed marijuana dispensary located at 643 N. Avalon Blvd., Wilmington, California (the "Avalon Dispensary") stating they were being robbed at gunpoint.   LAPD Officers arrived at the Avalon Dispensary a short time later and conducted a surround and call-out for all individuals inside.   A total of four individuals emerged from the Avalon Dispensary and were then temporarily taken into custody but later determined to be four Cooperating Witnesses ("CWs") hereinafter referred to by their first and last initials.   Officers cleared the Avalon Dispensary of any additional suspects and began their investigation.

12.   On June 15, 2022, FBI Task Force Officer ("TFO") Christopher Lindberg and I conducted an interview of CW T.D. who informed us of the following:

a.   T.D. works as a security guard at the Avalon Dispensary.   On the evening of June 13, 2022, T.D. was walking out of the Avalon Dispensary to smoke a cigarette when a Hispanic male with a baseball hat (later identified as PACHECO) walked past him and into the store.   When T.D. went outside to smoke, another Hispanic male with a tattoo on his face (later identified as MARTINEZ) approached T.D., asked if T.D. worked at the dispensary, and T.D. responded that he did.   T.D. then

walked inside the Avalon Dispensary with MARTINEZ and, a short time later, saw that MARTINEZ had drawn a handgun and pointed it through the security window.

      b.    T.D. then ran out of the Avalon Dispensary and attempted to call 911 twice but was unable to reach a dispatcher.

      c.    T.D. was fearful for his safety.

      d.    T.D was able to record a video of the license plate of the robbery suspects' vehicle which he then provided to law enforcement officers.  I later watched this video and the vehicle shown in the video is **SUBJECT VEHICLE 1**.

13.    On June 15, 2022, TFO Lindberg and I conducted an interview of CW C.B who informed us of the following:

      a.    C.B. works as a budtender at the Avalon Dispensary.

      b.    On the evening of June 13, 2022, a Hispanic male in all black (identified later as MARTINEZ) entered the Avalon Dispensary and went inside the security office where a security guard was seated.  C.B. observed MARTINEZ pull an object out and point it at the guard in the office.

      c.    A Hispanic male in a blue baseball hat (identified later as PACHECO) was also inside the Avalon Dispensary and had a handgun.  At some point during the robbery, PACHECO started packing up marijuana products.

      d.    MARTINEZ had a gun in his hand and demanded that C.B open the safe.  C.B. told MARTINEZ he did not know the combination.  MARTINEZ then walked over to the Avalon

Dispensary's cash drawer and took all the cash, which totaled approximately $1,000.

    e.   C.B. was scared for his safety.

    f.   One of the robbers told C.B. they were taking the "weed" and the "cash" for payment due to money being owed to them.

    g.   C.B. stated that he recognized MARTINEZ from an earlier encounter at the Avalon Dispensary.  During that encounter, MARTINEZ came to the store and asked to speak to whoever was in charge concerning "money."

14.   On June 16, 2022, TFO Lindberg and I conducted an interview of CW L.R. who informed us of the following:

    a.   On the evening of June 13, 2022, two Hispanic males entered the Avalon Dispensary and told everyone to get off their phones and be quiet.

    b.   A Hispanic male in a blue baseball hat (PACHECO) told L.R. that, "you know who I am" and "you know how this goes."  At this point, L.R believed that a robbery was in progress.

    c.   The other robber threw something at L.R and ordered her to "put the money together" referring to the money in the cash drawer.  L.R. then collected all of the cash from the Avalon Dispensary cash drawer, stacked it up, and handed the cash to the other robber.

15.   On June 16, 2022, TFO Lindberg and I conducted an interview of CW J.B. who informed us of the following:

      a.   J.B. also works as a security guard at the Avalon Dispensary.

      b.   On the evening of June 13, 2022, two Hispanic males robbed the Avalon Dispensary. One of the Hispanic males told J.B. "you know what this is" which J.B. interpreted as the males were going to rob the store.

      c.   One of the Hispanic males pulled a gun and pointed it at J.B. and told him to open the interior door leading inside the Avalon Dispensary. Once inside, one of the robbers (later identified as PACHECO) told J.B. to buzz the other robber (later identified as MARTINEZ) in so that MARTINEZ could enter the Avalon Dispensary.

      d.   One of the robbers, a Hispanic male with a face tattoo (MARTINEZ), told J.B. that he had been by the Avalon Dispensary before and had not been allowed to enter.

16.   The day after the robbery, on June 14, 2022, TFO Lindberg went to the Avalon Dispensary. TFO Lindberg identified himself to the security guard on duty and explained he was the investigating officer for the robbery that had occurred the previous night. The manager of the dispensary, R.C., allowed TFO Lindberg to download the video surveillance footage from the robbery. The surveillance footage captured events from the street outside the Avalon Dispensary and inside the store during the robbery.

17.   On or about June 14, 2022, TFO Lindberg interviewed a customer ("J.M.") who had attempted to enter the Avalon Dispensary during the robbery on June 13, 2022. After

attempting to enter the store without success, J.M. stood on the sidewalk in front of the Avalon Dispensary on J.M.'s phone. While he was standing on the sidewalk, J.M. was approached by a Black male (later identified as GIPSON). GIPSON demanded J.M. to hand over his/her cell phone. J.M. ignored GIPSON's demand and continued to look at the cell phone. GIPSON then forcefully grabbed J.M.'s cell phone from J.M.'s hand. J.M. fought with GIPSON to retrieve the cell phone without success. J.M. then departed the area until officers approached the Avalon Dispensary. J.M. later returned to the area near the dispensary and was interviewed by responding officers.

18. Later in the day, TFO Lindberg and I reviewed the video footage and observed the following sequence of events that occurred on June 13, 2022:

a. At approximately 10:01 p.m.,[2] **SUBJECT VEHICLE 1** drove northbound on Avalon Blvd. and parked across the street from the Avalon Dispensary. A black male (later identified as GIPSON) got out of the rear driver's side door of **SUBJECT VEHICLE 1** door and an unknown male ("UM") exited the rear passenger side door. The two males walked across the street and entered the Avalon Dispensary. Once inside, the two males

---

[2] While downloading the video footage, TFO Lindberg observed the timestamp on the DVR recording device was one hour ahead. TFO Lindberg confirmed this by looking at the time stamp of the live video feed and compared it to the time on his phone. The difference was one hour. All times denoted are the correct times although the surveillance footage is time-stamped one hour ahead of real time.

approached the service window and engaged in conversation[3] with
Avalon Dispensary employee J.B.  GIPSON and the UM both
attempted to open the door leading to the interior of the Avalon
Dispensary but could not open it.  GIPSON and UM then exited the
business and re-entered **SUBJECT VEHICLE 1** which had, in the
meantime, moved such that it was now parked directly in front of
the Avalon Dispensary.

      b.  At approximately 10:04 p.m., PACHECO got out of
the front passenger seat of **SUBJECT VEHICLE 1** and entered the
Avalon Dispensary.[4]  PACHECO made contact with J.B. and handed
J.B. what appeared to be an identification card.  J.B. then
unlocked the door to the interior of the dispensary and allowed
PACHECO inside.  PACHECO then tried to walk into the security
office where J.B. was sitting while J.B. made an effort to
prevent PACHECO from entering.  PACHECO continued to try and
gain access to the Avalon Dispensary security office while J.B.
resisted.

      c.  While PACHECO tussled with J.B., MARTINEZ[5] got out
of the front driver's seat of **SUBJECT VEHICLE 1** and encountered
T.D outside.  MARTINEZ and T.D. then walked into the lobby of
the Avalon Dispensary together.  Soon after entering, MARTINEZ
drew a black handgun from his waistband and pointed it at J.B.

---

[3] The surveillance system only captured video and no audio.

[4] As discussed further below, I identified PACHECO based on
a comparison of his CCHRS photograph and the individual shown in
the surveillance video.

[5] As discussed further below, I identified MARTINEZ based on
a comparison of his CCHRS photograph and the individual shown in
the surveillance video.

through the service window.  Around this same time, PACHECO drew a silver and black handgun from his jacket and briefly pointed it at J.B.  J.B. then walked towards a button that unlocked the interior door with PACHECO standing closely to him.   MARTINEZ then walked through the now unlocked door and into the interior of the Avalon Dispensary.

d.   At approximately 10:05 p.m., MARTINEZ walked with his handgun behind the sales counter.  MARTINEZ pointed his gun at C.B.  MARTINEZ continued to walk to the rear of the Avalon Dispensary.  MARTINEZ encountered a back room with an open door. MARTINEZ cautiously pointed his weapon inside as if he was looking for any individuals hiding.  MARTINEZ then walked back towards the front of the business and engaged in conversation with C.B.  MARTINEZ's handgun was still in his hand and pointed towards the floor by his side.  L.R was standing near C.B. MARTINEZ walked with L.R to a cash drawer located behind the counter.

e.   MARTINEZ grabbed a U.S. currency bill from the cash drawer and placed it on the table while motioning to L.R. L.R. then emptied the cash drawer of U.S. currency and placed it in a stack while MARTINEZ stood nearby now holding his handgun at waist level.  MARTINEZ took the U.S. currency, placed it in his front left pants pocket, and walked to the security office where J.B. was still sitting while being monitored by PACHECO whose gun was in his hand.[6]

---

[6] My understanding is that the Supreme Court has held that if a robber targeted a marijuana dealer's drugs or proceeds,

f.   At approximately 10:06 p.m., MARTINEZ entered the security office and PACHECO walked out.  MARTINEZ sat next to J.B. and placed his handgun on his lap appearing to continue to monitor J.B.  PACHECO then walked to the rear of the business and grabbed two empty plastic bins.  PACHECO began loading the plastic bins with marijuana products from the dispensary display cabinets.

g.   At approximately 10:09 p.m., an individual that appeared to be a customer (later identified as J.M.), attempted to enter the store but was unable to, exited the business and stood outside on his or her cell phone.  Seconds later, GISPON and UM exited **SUBJECT VEHICLE 1** and approached J.M.  GIPSON pointed at J.M.'s cell phone and, when GIPSON obtained little reaction from J.M., GIPSON grabbed the cell phone from J.M.'s hands and a physical altercation began.  UM jumped out of the driver's seat of **SUBJECT VEHICLE 1** and intervened in the ongoing physical altercation between GIPSON and J.M.

h.   At approximately 10:11 p.m., MARTINEZ exited the security office and PACHECO abruptly stopped loading marijuana products into the plastic bins.  PACHECO entered the security office to keep watch over J.B. while MARTINEZ exited the Avalon Dispensary and walked towards the altercation between J.M, UM, and GIPSON.  J.M., GIPSON, and UM are out of view briefly and then GIPSON is seen walking back towards **SUBJECT VEHICLE 1**

---

that is sufficient to establish an effect on interstate commerce.  See Taylor v. United States, 136 S. Ct. 2074, 2081-82 (2016).

appearing to search the area for something.  During this time, T.D. can be seen holding his cell phone and appears to be recording **SUBJECT VEHICLE 1**.[7]

     i.   At approximately 10:13 p.m., MARTINEZ re-entered the Avalon Dispensary and appeared to be yelling through the service window.  UM re-entered **SUBJECT VEHICLE 1** in the driver's seat and GIPSON entered the front passenger seat.  PACHECO, who was still inside the security office with J.B, quickly exited and grabbed one of plastic bins of marijuana products and walked towards the exit to the interior of the business.  As he exited, J.B. pulled a firearm from his ankle and pointed it towards the exit.  PACHECO dropped the bin he had been holding and ran out of the Avalon Dispensary with MARTINEZ.  PACHECO and MARTINEZ both entered the rear of **SUBJECT VEHICLE 1** and the vehicle departed at a high rate of speed southbound on Avalon Blvd. and out of sight of the surveillance system.

    **C.**   **Law Enforcement Identifies MARTINEZ, PACHECO, and GIPSON as Avalon Dispensary Robbers**

    19.   On June 14, 2022, TFO Lindberg showed LAPD Officer Campos the robbery surveillance video and the video provided by T.D.  Officer Campos immediately recognized the license plate belonging to **SUBJECT VEHICLE 1** as a vehicle he had traffic

---

[7] LAPD Officer Castro later obtained the video that T.D. recorded which clearly captured the license plate to **SUBJECT VEHICLE 1**.  LAPD Officer Clayborn later searched the same area where **SUBJECT VEHICLE 1** was parked and discovered a cell phone and a California Identification Card for GIPSON.  Law enforcement was able to identify GIPSON on the surveillance video from the Avalon Dispensary based on similarities between footage of him and his California ID photo.

stopped several weeks prior.  TFO Lindberg then showed Officer Campos the surveillance video capturing MARTINEZ.  Officer Campos immediately recognized MARTINEZ as the individual who was in the front passenger seat of **SUBJECT VEHICLE 1** during the traffic stop.

20.  Officer Lindberg and I later reviewed Officer Campos's body worn video of the traffic stop of **SUBJECT VEHICLE 1** on or about May 31, 2022.  Officer Campos stopped **SUBJECT VEHICLE 1** for forward obstruction in violation of California Vehicle Code ("VC") 26708.  Two Hispanic males were inside the vehicle.  Upon conducting the traffic stop, Officer Campos observed a large amount of marijuana in plain view on the passenger side of the vehicle.  The Hispanic males were ordered out of the vehicle and identified.  The Hispanic male in the passenger side of the vehicle provided a Mexican identification card identifying himself as MARTINEZ.

21.  I compared the body camera footage to the Avalon Dispensary robbery surveillance video and confirmed that MARTINEZ was the individual who brandished a firearm and grabbed the cash during the robbery.  I confirmed that in both videos, MARTINEZ had a tattoo on the right side of his face near his cheek.  I further reviewed a Consolidated Criminal History Report ("CCHRS") photograph of MARTINEZ which also confirmed MARTINEZ was one of the robbers.  MARTINEZ's CCHRS report identified him as a gang member with the moniker "Firm."  I reviewed multiple Field Interviews ("FI") of MARTINEZ where he was identified as a Westside Wilmas gang member.

22.  On June 14, 2022, TFO Lindberg showed LAPD Officer Welch the video surveillance footage from the Avalon Dispensary. Officer Welch immediately recognized PACHECO as the Hispanic male with the blue baseball hat in the footage.  Officer Welch stated that he had numerous law enforcement encounters with PACHECO.  During one such encounter on or about May 28, 2021, Officer Welch conducted a traffic stop of a Hispanic male for double parking on the street.  Officer Welch conducted an FI of the Hispanic male who identified himself as PACHECO.

23.  Based off the information provided by Officer Welch, TFO Lindberg pulled a CCHRS photograph of PACHECO.  TFO Lindberg and I reviewed the CCHRS photograph of PACHECO and compared it to the surveillance footage at the Avalon Dispensary and confirmed the male Hispanic in the blue baseball hat was in fact PACHECO.  PACHECO's CCHRS report also identified him as a gang member with the moniker "Goon."  I reviewed multiple FIs for PACHECO in where he is identified as a Westside Wilmas gang member.

24.  Based off Officer Clayborn's recovery of a California Identification Card for GIPSON in the area where **SUBJECT VEHICLE 1** had been parked in front of the Avalon Dispensary, TFO Lindberg pulled a CCHRS photograph of GIPSON as well as his DMV photograph.  TFO Lindberg and I reviewed all of these photographs of GIPSON as well and compared it to the video surveillance from the Avalon Dispensary and confirmed that GIPSON was the black male who drove to the Avalon Dispensary in **SUBJECT VEHICLE 1** and served as a lookout during the robbery.

**D.   Investigators Confirm That MARTINEZ Resides at SUBJECT PREMISES 1, GIPSON Resides at SUBJECT PREMISES 2, and PACHECO Resides at SUBJECT PREMISES 3**

25.   On June 15, 2022, I reviewed MARTINEZ's CCHRS report which lists **SUBJECT PREMISES 1** as his place of residence.

26.   On June 15, 2022, investigators set up surveillance at **SUBJECT PREMISES 1**.  Investigators observed **SUBJECT VEHICLE 2** arrive at **SUBJECT PREMISES 1** and park in the driveway.  MARTINEZ exited the vehicle, retrieved a backpack and a bag from the back seat, and walked up the driveway.  MARTINEZ was seen entering the gate leading to the backyard belonging to **SUBJECT PREMISES 1** and out of sight.

27.   On June 15, 2022, I looked up the Department of Motor Vehicle ("DMV") record for **SUBJECT VEHICLE 2** which revealed that the vehicle is registered at **SUBJECT PREMISES 1** to Claudia Herrera.

28.   On June 15, 2022, I queried an open-source law enforcement database which shows that MARTINEZ's current residence is **SUBJECT PREMISES 1**.

29.   On June 15, 2022, I queried GIPSON's DMV records which revealed that GIPSON's current residence is **SUBJECT PREMISES 2**.

30.   On June 15, 2022, investigators set up surveillance at **SUBJECT PREMISES 2**.  Investigators observed a Nissan Rogue pull up into the driveway of **SUBJECT PREMISES 2** and stop. Investigators then observed GIPSON exit **SUBJECT PREMISES 2** and enter the passenger side of the Rogue.  GIPSON was carrying a laundry bag which appeared to be full.  The vehicle drove to a nearby laundromat where an unknown person exited the driver's

side of the vehicle and entered the laundromat.  GIPSON got into the driver's seat of the vehicle and drove back towards **SUBJECT PREMISES 2.**

31.  On June 15, 2022, I queried an open-source law enforcement database which showed that GIPSON's latest address is listed as **SUBJECT PREMISES 2.**

32.  On June 15, 2022, I reviewed GIPSON's CCHRS report which lists **SUBJECT PREMISES 2** as his current residence.

33.  On or about June 16, 2022, I also reviewed PACHECO's CCHRS history which lists numerous addresses for PACHECO, including **SUBJECT PREMISES 3.**

34.  On or about June 16, 2022, I queried an open-source database for PACHECO which revealed that his current residence is **SUBJECT PREMISES 3.**

35.  On or about June 20, 2022, investigators set up surveillance at **SUBJECT PREMISES 3.**  PACHECO was seen exiting the front door of **SUBJECT PREMISES 3** and began walking around the fenced yard belonging to **SUBJECT PREMISES 3.** A short time later, PACHECO was observed walking back inside **SUBJECT PREMISES 3.**

**E.   MARTINEZ's Criminal History**

36.  On June 17, 2022, I reviewed a criminal history report for MARTINEZ and learned that MARTINEZ has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.    On or about December 13, 2017, a violation of California Penal Code ("PC") 459 – (Burglary), in the Superior Court for the State of California, County of Los Angeles, Case Number YA097056.

b.    On or about August 24, 2015, a violation of California PC 459 – Burglary, in the Superior Court for the State of California, County of Los Angeles, Case Number YA092772.

## IV. <u>TRAINING AND EXPERIENCE ON ROBBERIES</u>

37.   From my training, personal experience, and the collective experiences related to me by other more experienced law enforcement officers who conduct robbery investigations, I have learned that robbers will use cell phones or smart phones for some or all of the following reasons:

a.    They will use website mapping programs (i.e. Google or Bing) to see where target stores are located in a specific area;

b.    They will search online newspaper articles to read what information is available regarding the robberies;

c.    They will search online newspaper articles or websites dedicated to unknown robbery subjects to view the bank security images of the robbery/robber;

d.    They will use their phone to:

i.    Take photos/video of potential locations they considered targeting.

ii.  Take photos of the items they have taken from a robbery.

iii. Take photos of trips or places they have been following a robbery – at times showing an influx of income they normally did not have;

iv.  They will send text messages to coconspirators and/or associates/friends indicating what (criminal) activities they have been engaged in;

v.   They will use the mapping application on their phone to get directions to/from a location;

vi.  They will send communications (including photographs of stolen merchandise) to prospective buyers of stolen merchandise, including "fences".

vii. Communications between the robber and any accomplices, such as a getaway driver.

e.   In addition, the search of a cell phone can reveal GPS location information including historical location data to show whether the robber's phone was located near the robberies around the time of those robberies.

### V.  <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

38.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as

items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these

photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[8]

39.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[8] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

40. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

42.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MARTINEZ's, PACHECO's, or GIPSON's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MARTINEZ's, PACHECO's, or GIPSON's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

43.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  **CONCLUSION**

44.  For all of the reasons described above, there is probable cause to believe that MARTINEZ, PACHECO, and GIPSON have committed a violation of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of **SUBJECT PREMISES 1** described in Attachment A-1, **SUBJECT PREMISES 2** as described in Attachment A-2, **SUBJECT PREMISES 3** as described in Attachment A-3, **SUBJECT VEHICLE 1** as described in Attachment A-4, **SUBJECT VEHICLE 2** as described in at Attachment A-5, the person of MARTINEZ as described in Attachment A-6, the person of PACHECO as described in Attachment A-7, and the person of GIPSON as described in Attachment A-8.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  22nd day of June, 2022.

_____  PVC
UNITED STATES MAGISTRATE JUDGE